JAMES C. YOON, State Bar No. 177155
jyoon@wsgr.com
RYAN R. SMITH, State Bar No. 229323
rsmith@wsgr.com
ALBERT SHIH, State Bar No. 251726
ashih@wsgr.com
CHRISTOPHER D. MAYS, State Bar No. 266510
cmays@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, California 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100

LUCY YEN, State Bar No. 224559
lyen@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, New York 10019-6022
Telephone: (212) 999-5800
Facsimile: (212) 999-5899

CELINE LIU, State Bar No. 268990
celine.liu@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1700 K Street NW, Fifth Floor
Washington, District of Columbia 20006-3817
Telephone: (202) 973-8800
Facsimile: (202) 973-8899

*Attorneys for Plaintiff Epistar Corporation*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Epistar Corporation,<br><br>          Plaintiff,<br><br>      v.<br><br>Lowe's Home Centers, LLC<br><br>          Defendant. | Case No.: 2-17-cv-03219 JAK (KSx)<br><br>**PLAINTIFF EPISTAR CORPORATION'S COMBINED OPPOSITION TO LHC'S TRIAL AND POST-TRIAL MOTIONS**<br><br>Date:     April 4, 2022<br>Time:    1:30 p.m.<br>Place:   Courtroom 10B<br>Before: Honorable John A. Kronstadt |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ....................................................................................................1

II.  ARGUMENT ..........................................................................................................1

    A.   Legal Standards for JMOL and New Trial Motions ......................................1

    B.   LHC Failed to Prove Obviousness of the '738 and '780 Patents by
        Clear and Convincing Evidence ....................................................................2

        1.   Legal Standards for Proving Obviousness ...........................................3

            a.   Use of Hindsight Is Impermissible .............................................3

            b.   Every *Graham* Factor Must Be Considered ..............................4

            c.   Objective Indicia Are Highly Probative of
                Nonobviousness ...........................................................................4

            d.   Motivation to Modify and Expectation of Success
                Required .......................................................................................5

        2.   The '738 Patent Is Not Obvious ...........................................................6

            a.   The Objective Indicia of Nonobviousness Are
                Undisputed. .................................................................................6

                i.   The Jury's Finding That the '738 Patent Solved
                    a Long-Felt Need Forecloses Obviousness ....................6

                  ii.  The Jury's Finding of Acceptance by Others
                    Forecloses Obviousness ..................................................7

            b.   Dr. Goldhabor-Gordon's Flawed Methodology Does
                  Not Overcome the Objective Indicia of
                  Nonobviousness ...........................................................................8

        3.   The '780 Patent Is Not Obvious ...........................................................13

            a.   Ferguson's Use of Non-Analogous Art Shows
                 Hindsight ....................................................................................13

            b.   The Jury's Finding That the '780 Patent Solved a Long-
                 Felt Need Forecloses Obviousness. .............................................14

            c.   LHC Is Not Entitled to JMOL or a New Trial ..........................15

    C.   LHC Is Not Entitled to JMOL or a New Trial on Infringement of the
        '780 Patent and/or Representativeness .........................................................16

        1.   Given Dr. Fitzgerald's and EAG's Analysis, There Is More
            Than Substantial Evidence Supporting the Jury's Verdict. ..............16

2. LHC's Motion Is an Improper Motion for Reconsideration..............17

D. LHC Is Not Entitled to JMOL or a New Trial on the '771 Patent..............18

   1. LHC Is Not Entitled to JMOL or a New Trial on Infringement ..................................................................................19

   2. LHC's Untimely Indefiniteness Defense Is Flawed .........................20

E. The Court Should Not Vacate or Remit the Jury's Damages Award ..........21

   1. Apportionment by Comparable Licenses Is Proper...........................21

   2. LHC Is Not Entitled to Vacatur or a New Trial on Damages............23

      a. Epistar Did Not Fail the Apportionment Requirement ..........24

      b. The Verdict Is Not Inconsistent with the Trial Record ..........27

      c. Substantial Evidence Supports Using Net Sales ....................27

F. LHC Is Not Entitled to JMOL on Willful Infringement ..............................28

   1. Epistar's Notice Was Adequate .......................................................29

   2. The Jury Was Permitted to Consider LHC's Post-Suit Conduct ...................................................................................30

III. CONCLUSION.........................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*ActiveVideo Networks, Inc. v. Verizon Communs., Inc.,*
694 F.3d 1312 (Fed. Cir. 2012) ................................................................10, 22, 25

*Adidas AG v. Nike, Inc.,*
963 F.3d 1355 (Fed. Cir. 2020) ...........................................................................9

*Adidas Am., Inc. v. Skechers USA, Inc.,*
No. 3:16-CV-1400-SI, 2017 WL 2543811 (D. Or. June 12, 2017) ......................30

*Airbus S.A.S. v. Firepass Corp.,*
941 F.3d 1374 (Fed. Cir. 2019) ..........................................................................13

*Apple Inc. v. INVT SPE LLC,*
851 F. App'x 200 (Fed. Cir. 2021) ........................................................................9

*Apple Inc. v. Motorola, Inc.,*
757 F.3d 1286 (Fed. Cir. 2014) ....................................................................22, 25

*Apple Inc. v. Samsung Elecs. Co., Ltd.,*
839 F.3d 1034 (Fed. Cir. 2016) (*en banc*) .........................................................4, 6

*Apple Inc. v. Samsung Elecs. Co.,*
No. 11-cv-01846-LHK, 2016 U.S. Dist. LEXIS 17596 (N.D. Cal. Feb. 10, 2016) ...............................................................................................................18

*AstraZeneca AB v. Mylan Pharms. Inc.,*
No. 2021-1729, 2021 U.S. App. LEXIS 36127 (Fed. Cir. Dec. 8, 2021) .............10

*Bayer HealthCare LLC v. Baxalta Inc.,*
989 F.3d 964 (Fed. Cir. 2021) ......................................................................21, 27

*Bio-Rad Labs., Inc. v. 10X Genomics Inc.,*
967 F.3d 1353 (Fed. Cir. 2020) ..........................................................................22

*Bright Harvest Sweet Potato Co. v. H.J. Heinz Co., L.P.,*
760 F. App'x 537 (9th Cir. 2019).........................................................................16

*Callicrate v. Wadsworth Mfg.,*
427 F.3d 1361 (Fed. Cir. 2005) .............................................................................1

*Castro v. Cty. of L.A.,*
833 F.3d 1060 (9th Cir. 2016) (*en banc*)...............................................................1

*CG Tech. Dev., LLC v. FanDuel, Inc.,*
No. 2:16-CV-00801-RCJ-VCF, 2017 WL 58572 (D. Nev. Jan. 4, 2017) ............30

*Chisholm Bros. Farm Equip. Co. v. Int'l Harvester Co.,*
498 F.2d 1137 (9th Cir. 1974)...............................................................................2

*Coleman Co.. v. Team Worldwide Corp.*,
    No. 2:20-cv-351, D.I. 227 (E.D. Va. Jan. 31, 2022) ................................25

*Consol. Edison Co. v. NLRB*,
    305 U.S. 197 (1938)..................................................................................2

*Corbrus, LLC v. 8th Bridge Capital, Inc.*,
    No. 2:19-cv-10182-CAS(AFMx), 2021 U.S. Dist. LEXIS 189204 (C.D.
    Cal. Aug. 9, 2021)...................................................................................27

*Crocs, Inc. v. Int'l Trade Comm'n*,
    598 F.3d 1294 (Fed. Cir. 2010) ...............................................................4

*Eagleview Techs., Inc. v. Xactware Sols., Inc.*,
    522 F. Supp. 3d 40 (D.N.J. 2021)...........................................................30

*Eli Lilly & Co. v. Teva Pharm. Int'l GmbH*,
    8 F.4th 1331 (Fed. Cir. 2021) ..........................................................2, 3, 5

*Ericsson, Inc. v. D-Link Sys.*,
    773 F.3d 1201 (Fed. Cir. 2014) ...........................................21, 22, 23, 25

*Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*,
    778 F.3d 1059 (9th Cir. 2015) ..................................................................2

*Funai Elec. Co. v. Daewoo Elecs. Corp.*,
    616 F.3d 1357 (Fed. Cir. 2010) .............................................................28

*Graham v. John Deere Co.*,
    383 U.S. 1 (1966).............................................................................*passim*

*Hoist Fitness Sys., Inc. v. TuffStuff Fitness Int'l, Inc.*,
    No. ED CV 17-01388-AB(KKx), 2019 WL 6481307 (C.D. Cal. Aug. 27,
    2019) .......................................................................................................19

*Hydrodynamic Indus. Co. v. Green Max Distribs.*,
    21 F. Supp. 3d 1074 (C.D. Cal. 2014)......................................................2

*Innogenetics, N.V. v. Abbott Labs.*,
    512 F.3d 1363 (Fed. Cir. 2008) ......................................................*passim*

*Insite Vision Inc. v. Sandoz, Inc.*,
    783 F.3d 853 (Fed. Cir. 2015) ................................................................12

*Intendis GmbH v. Glenmark Pharm. Inc.*,
    822 F.3d 1355 (Fed. Cir. 2016) ................................................................9

*In re Kahn*,
    441 F.3d 977 (Fed. Cir. 2006) ................................................................13

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007)..............................................................................4, 5

*Lakeside-Scott v. Multnomah Cty.*,
    556 F.3d 797 (9th Cir. 2009) ....................................................................2

*Leo Pharm. Prods., Ltd. v. Rea*,
 726 F.3d 1346 (Fed. Cir. 2013) ............................................................. 4, 5

*Liquid Dynamics Corp. v. Vaughan Co.*,
 449 F.3d 1209 (Fed. Cir. 2006) ................................................................. 29

*Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*,
 370 F.3d 1354 (Fed. Cir. 2004) .......................................................... 15, 16

*Millennium Pharms., Inc. v. Sandoz Inc.*,
 862 F.3d 1356 (Fed. Cir. 2017) ............................................................. 4, 12

*Minks v. Polaris Indus.*,
 546 F.3d 1364 (Fed. Cir. 2008) ................................................................. 28

*Mintz v. Dietz & Watson, Inc.*,
 679 F.3d 1372 (Fed. Cir. 2012) ............................................................... 4, 5

*Monsanto Co. v. McFarling*,
 488 F.3d 973 (Fed. Cir. 2007) .................................................................. 21

*Omega Patents, LLC v. CalAmp Corp.*,
 13 F.4th 1361 (Fed. Cir. 2021) ........................................................ *passim*

*Ortho–McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
 520 F.3d 1358 (Fed. Cir. 2008) ................................................................... 4

*OSI Pharms., LLC v. Apotex Inc.*,
 939 F.3d 1375 (Fed. Cir. 2019) ............................................................. 5, 14

*Pentec, Inc. v. Graphic Controls Corp.*,
 776 F.2d 309 (Fed. Cir. 1985) .................................................................. 13

*Phillips v. AWH Corp.*,
 415 F.3d 1303 (Fed. Cir. 2005) ................................................................. 19

*Powell v. Home Depot U.S.A., Inc.*,
 715 F. Supp. 2d 1285 (S.D. Fla. 2010), *aff'd*, 663 F.3d 1221 (Fed. Cir.
 2011) ........................................................................................................ 29

*Radware, Ltd. v. F5 Networks, Inc.*,
 No. 5:13-CV-02024-RMW, 2016 WL 4427490 (N.D. Cal. Aug. 22,
 2016) ........................................................................................................ 30

*Sci. Plastic Prod., Inc. v. Biotage AB*,
 766 F.3d 1355 (Fed. Cir. 2014) ................................................................... 3

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs*,
 251 F.3d 814 (9th Cir. 2001) ....................................................................... 2

*Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*,
 844 F.3d 1370 (Fed. Cir. 2017) ................................................................. 20

*Sunoco P'ship Mktg. & Terminals L.P. v. U.S. Venture, Inc.*,
 436 F. Supp. 3d 1099 (N.D. Ill. 2020) ...................................................... 29

*TecSec, Inc. v. Adobe Inc.*,
    978 F.3d 1278 (Fed. Cir. 2020) ...................................................................23

*Thorner v. Sony Comput. Ent. Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) ...................................................................19

*TQ Delta, LLC v. Cisco Sys., Inc.*,
    942 F.3d 1352 (Fed. Cir. 2019) ...................................................................14

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*,
    699 F.3d 1340 (Fed. Cir. 2012) ..............................................................5, 7, 8

*Univ. of Strathclyde v. Clear-Vu Lighting LLC*,
    No. 2020-2243, 2021 U.S. App. LEXIS 32872 (Fed. Cir. Nov. 4, 2021)........13, 14

*Unwired Planet, LLC v. Google Inc.*,
    841 F.3d 995 (Fed. Cir. 2016) .....................................................................16

*Vectura Ltd. v. GlaxoSmithKline LLC*,
    981 F.3d 1030 (Fed. Cir. 2020) ..............................................................21, 22

*William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*,
    668 F.2d 1014 (9th Cir. 1981) ..................................................................2, 18

*Zapfraud, Inc. v. Barracuda Networks*,
    528 F. Supp. 3d 247 (D. Del. 2021) .............................................................30

**STATUTES**

35 U.S.C. § 103(a) ............................................................................................3

35 U.S.C. § 282(a) ............................................................................................2

35 U.S.C. § 284 ...............................................................................................23

# I.   INTRODUCTION

LHC had every opportunity to present evidence and its arguments to the Court prior to trial and to the jury at trial.  LHC's consolidated Motion does not present any arguments which it did not already present to the Court and jury.  The Motion is not supported by facts or law.  LHC cannot, through post-trial motion practice, reargue a case that the jury evaluated and rejected.

After an eight-day trial—during which LHC was represented by a single fact witness with no involvement in sourcing the accused products, no understanding of any aspect of Epistar's patents, and no knowledge of any remedial efforts—LHC suggests that there was not a scintilla of evidence to support the jury's verdict.  LHC's arguments are purely rhetorical and unsupported by either the factual record or legal authority.

The Court should thus deny LHC's consolidated Motion.  LHC cannot prove obviousness by clear and convincing evidence: LHC failed to present evidence on necessary elements of its defense, and the jury found objective evidence of nonobviousness.  On infringement and damages, LHC's Motion is replete with attempts to reopen the merits to seek reconsideration of a previously denied *Daubert* motion.  Finally, on willfulness, LHC improperly asks the Court to weigh the evidence, ignore evidence favorable to Epistar, and draw inferences in LHC's favor.

LHC's arguments are legally baseless, factually unsupportable, and insufficient to reach the high bar necessary to set aside the verdict.

# II.   ARGUMENT

## A.   Legal Standards for JMOL and New Trial Motions

In the Ninth Circuit, a motion for JMOL "is properly granted only if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Castro v. Cty. of L.A.*, 833 F.3d 1060, 1066 (9th Cir. 2016) *(en banc)*.  A party seeking judgment as a matter of law must show that the verdict is not supported by "substantial evidence." *Callicrate v. Wadsworth Mfg.*, 427 F.3d 1361, 1366 (Fed. Cir. 2005).  Substantial evidence is anything

"more than a mere scintilla." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Chisholm Bros. Farm Equip. Co. v. Int'l Harvester Co.*, 498 F.2d 1137, 1140 (9th Cir. 1974). In other words, judgment as a matter of law is appropriate in the limited circumstance "when the jury could have relied only on speculation to reach its verdict." *Lakeside-Scott v. Multnomah Cty.*, 556 F.3d 797, 803 (9th Cir. 2009). When reviewing a motion for JMOL, courts must "draw all reasonable inferences in the favor of the non-mover, and disregard all evidence favorable to the moving party that the jury is not required to believe." *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1069 (9th Cir. 2015). Moreover, courts may not weigh the evidence or assess the credibility of witnesses in determining whether substantial evidence exists. *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1026 (9th Cir. 1981).

"[A] trial court may grant a new trial if the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice." *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001). However, "a district court may not grant a new trial simply because it would have arrived at a different verdict." *Id.*

## B. LHC Failed to Prove Obviousness of the '738 and '780 Patents by Clear and Convincing Evidence

In this case, the Court has undertaken the responsibility to make the ultimate determination regarding obviousness based on the factual findings made by the jury. *Hydrodynamic Indus. Co. v. Green Max Distribs.*, 21 F. Supp. 3d 1074, 1078 (C.D. Cal. 2014) (noting that courts "examine[] the ultimate legal conclusion of obviousness *de novo* to determine whether it is correct in light of the jury's factual findings"). The Court may only enter a judgment of obviousness if it determines that LHC proved obviousness by clear and convincing evidence, because "[a] patent shall be presumed valid." 35 U.S.C. § 282(a)*; see Eli Lilly & Co. v. Teva Pharm. Int'l GmbH*, 8 F.4th 1331, 1344 (Fed. Cir. 2021) ("A party seeking to invalidate a patent based on obviousness must demonstrate by clear and convincing evidence that a skilled artisan would have been

motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so.").  As the jury was instructed, "When a party has the burden of proving any claim or defense by clear and convincing evidence, it means that the party must present evidence that leaves you with a firm belief or conviction that it is highly probable that the factual contentions of the claim or defense are true."  D.I. 472, Day 1 Trial Tr. at 123:21-25.

Given that LHC failed to proffer evidence on required elements of the obviousness standard and the jury found objective evidence of non-obviousness, LHC simply cannot meet its burden of proof to invalidate the '738 and '780 Patents.

### 1.    Legal Standards for Proving Obviousness

A patent (which is presumed valid) may only be invalidated for obviousness "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art ["POSITA"] to which said subject matter pertains."  35 U.S.C. § 103(a) (pre-AIA).

### a.    Use of Hindsight Is Impermissible

The obviousness analysis requires the factfinder to place itself in the shoes of a POSITA *at the time of the patent's invention* and determine whether the prior art as it existed at the time would have rendered the claimed invention obvious.  *See Sci. Plastic Prod., Inc. v. Biotage AB*, 766 F.3d 1355, 1359 (Fed. Cir. 2014) ("the pertinence of the reference as a source of solution to the inventor's problem must be recognizable with the *foresight* of a person of ordinary skill, not with the *hindsight* of the inventor's successful achievement.").[1]  Thus, the factfinder must guard against slipping into the use of hindsight by "resist[ing] the temptation to read into the prior art the teachings of the invention in issue."  *Graham v. John Deere Co.*, 383 U.S. 1, 36 (1966).   Factfinders must be

---

[1] Unless otherwise indicated, emphasis in quotations is emphasis added.

particularly cautious "of arguments reliant upon *ex post* reasoning" because such arguments create a "hindsight bias" that distorts the obviousness analysis. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007); *see also Millennium Pharms., Inc. v. Sandoz Inc.*, 862 F.3d 1356, 1367 (Fed. Cir. 2017) ("[t]he inventor's own path itself never leads to a conclusion of obviousness; that is hindsight.  What matters is the path that the [POSITA] would have followed").

### b.    Every *Graham* Factor Must Be Considered

To guard against the impermissible use of hindsight, courts begin the obviousness analysis by considering several factual inquiries: (1) "the scope and content of the prior art"; (2) "the differences between the prior art and the claims at issue"; (3) "the level of ordinary skill in the pertinent art"; and (4) objective indicia of nonobviousness. *Graham*, 383 U.S. at 17.  These factual inquiries "can be important to ward against falling into the forbidden use of hindsight." *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1379 (Fed. Cir. 2012).  Failure to consider *each* independent *Graham* factor is legal error. *See Apple Inc. v. Samsung Elecs. Co., Ltd.*, 839 F.3d 1034, 1048 (Fed. Cir. 2016) (*en banc*) ("A determination of whether a patent claim is invalid as obvious under § 103 requires consideration of all four *Graham* factors, and it is error to reach a conclusion of obviousness until all those factors are considered.").

### c.    Objective Indicia Are Highly Probative of Nonobviousness

Objective indicia of nonobviousness, as considered by the jury in the verdict form, "play a critical role in the obviousness analysis." *Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1358 (Fed. Cir. 2013).  They are "not just a cumulative or confirmatory part of the obviousness calculus but constitute[] *independent* evidence of nonobviousness." *Ortho–McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1365 (Fed. Cir. 2008). Objective indicia "can be the most probative evidence of non-obviousness in the record." *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1310 (Fed. Cir. 2010).  This is because "the objective indicia of nonobviousness are crucial in avoiding the trap of hindsight when reviewing, what otherwise seems like, a combination of known elements." *Leo Pharm.*,

726 F.3d at 1358; *see also Mintz*, 679 F.3d at 1379 ("Obviousness requires a court to walk a tightrope blindfolded (to avoid hindsight)—an enterprise best pursued with the safety net of objective evidence.").  In particular, objective indicia of nonobviousness "help turn back the clock and place the claims in the context that led to their invention." *Id.* at 1378.  As the Federal Circuit commented in *Mintz*:

> Technical advance, like much of human endeavor, often occurs through incremental steps toward greater goals.  These marginal advances in retrospect may seem deceptively simple, particularly when retracing the path already blazed by the inventor.  For these reasons, this court requires consideration of these objective indicia because they provide objective evidence of how the patented device is viewed in the marketplace, by those directly interested in the product.

*Id.*  For these reasons, objective indicia "must ***always*** when present ***be considered*** en route to a determination of obviousness." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1349 (Fed. Cir. 2012).

### d.    Motivation to Modify and Expectation of Success Required

A patent challenger must also prove by clear and convincing evidence that (1) a POSITA "would have been motivated to combine the teachings of the prior art references to achieve the claimed invention," and that (2) the POSITA "would have had a reasonable expectation of success in doing so." *Eli Lilly & Co.*, 8 F.4th at 1344.  This is because a patent challenger cannot prove obviousness "merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR*, 550 U.S. at 418-19 ("[I]nventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known."); *see also OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1385 (Fed. Cir. 2019) (claim not obvious where "[i]t is only with the benefit of hindsight that a person of skill in the art would have had a reasonable expectation of success in view of the asserted references."); *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1374 n.3 (Fed. Cir. 2008) ("We must still be careful not to allow hindsight

reconstruction of references to reach the claimed invention without any explanation as to how or why the references would be combined to produce the claimed invention.").

### 2. The '738 Patent Is Not Obvious

#### a. The Objective Indicia of Nonobviousness Are Undisputed.

The objective indicia strongly weigh against any finding of obviousness. As discussed above in § II.B.1.c., objective indicia are highly probative of nonobviousness because they guard against any hindsight bias. *See supra* (citing cases). Here, the jury determined that two objective indicia (long-felt need and acceptance by others) demonstrated the non-obviousness of the '738 Patent. As discussed below, the jury's findings on these objective indicia were supported by substantial evidence and testimony from Dr. Fitzgerald and were not disputed by LHC's expert (Dr. Goldhabor-Gordon).

##### i. The Jury's Finding That the '738 Patent Solved a Long-Felt Need Forecloses Obviousness

"Evidence of a long-felt but unresolved need can weigh in favor of the non-obviousness of an invention because it is reasonable to infer the need would not have persisted had the solution been obvious." *Apple Inc.*, 839 F.3d at 1056. Epistar offered evidence of both a long-felt need and how the claimed inventions of the '738 Patent solved that need. For example, Epistar's expert Dr. Fitzgerald discussed the history of LED light bulb technology. He testified that early LED light bulbs lacked omnidirectional capability due to large heat sinks that blocked light in certain directions. D.I. 462, Day 2 PM Trial Tr. at 66:4-22 ("you have a gigantic heat sink that has to be below, and what that does is you can see here is kind of like only the upper part light can come out. So it's more like a flashlight where light tends to come out in only half of the direction."); *see also* D.I. 467, Day 7 PM Trial Tr. at 112:20-113:23. This problem was solved by the invention of the filament light bulb, to which the claims of the '738 Patents were directed. *See* D.I. 462, Day 2 PM Trial Tr. at 66:25-67:18 ("So the LED filament bulbs have these little tiny LEDs all along the way here now . . . Customers like the idea that you can plug this thing in and light goes out in all directions"; "One other advantage of that is when the tiny LEDs

spread out like that, thermal management is much easier.").

Thus, as explained by Dr. Fitzgerald, filament light bulbs solved interrelated needs of creating omnidirectionality in the light bulbs and reducing the need for large heat sinks that inhibited that omnidirectionality.  Dr. Fitzgerald then explained how the claims of the '738 Patent were "***fundamental*** to the design of LED filament bulbs," that one could not implement a filament light bulb without practicing the claims of the '738 patent, and that there are ***no non-infringing alternatives*** to the '738 Patent.  *See* D.I. 463, Day 3 PM Trial Tr. at 9:12-22.  Dr. Fitzgerald further explained how the '738 Patent's claims allow light to pass "out in all directions" and "the heat to be broadly dissipated."  *See id.* at 8:13-9:11; D.I. 462, Day 2 PM Trial Tr. at 67:22-68:4.

Dr. Fitzgerald's analysis was undisputed by LHC's expert, Dr. Goldhabor-Gordon.  Dr. Goldhabor-Gordon concededly offered ***no opinion*** on any objective indicia of non-obviousness.  *See* D.I. 466, Day 6 PM Trial Tr. at 96:16-98:18 ("Q So your expert report and validity of the '738 patent did not discuss the secondary considerations that we discussed, correct?  A Yes. It did focus on the primary considerations.").  He also offered no opinions disputing Dr. Fitzgerald's testimony that (1) omnidirectionality and thermal management were known problems in the field of LED technology; (2) the claims of the '738 Patent solved those problems; (3) the '738 Patent's claims were fundamental to filament light bulbs; and/or (4) no non-infringing alternatives to the '738 Patent existed.  *See generally* D.I. 466, Day 6 PM Trial Tr. at 8:6-103:20.  Thus, Dr. Fitzgerald's unrebutted testimony strongly supports the jury's verdict that the ***claimed invention*** of the '738 Patent solved the long-felt needs described above.

### ii.   The Jury's Finding of Acceptance by Others Forecloses Obviousness

The jury's finding of the existence of a second objective consideration— "acceptance by others of the claimed invention as shown from the licensing of the claimed invention"—further forecloses any obviousness by clear and convincing evidence.  D.I. 455 at 5; *see Transocean*, 699 F.3d at 1353 (evidence regarding licensing by companies

not under threat of litigation demonstrate "that the licenses reflect the value of the claimed invention" and therefore are not obvious.).  Here, Epistar presented evidence that at least two third-party customers to Epistar (namely, Supertrend and QL Light Source) have licensed the '738 Patent without any contemporaneous threat of litigation.  *See* D.I. 473, Day 2 AM Trial Tr. at 75:9-12, 80:8-81:9; Trial Exs. 37, 38, and 41.  Moreover, in both license agreements, the '738 Patent is prominently listed as the first patent to be licensed, further highlighting its importance and value.  *See* Trial Ex. 37 at EPISTAR 0001840 and Trial Ex. 38 at EPISTAR 0001854.  Dr. Fitzgerald testified that these facts added to his conclusion that the asserted claims of the '738 Patent were not obvious.  *See* D.I. 467, Day 7 PM Trial Tr. at 112:20-113:23.

As before, Dr. Fitzgerald's opinions and conclusions regarding this objective factor were ***unrebutted*** – Dr. Goldhabor-Gordon offered no opinions on this issue and did not dispute Dr. Fitzgerald's conclusions regarding the impact of Epistar's successful licensing program on the validity of the '738 Patent.  *See generally* D.I. 466, Day 6 PM Trial Tr. at 8:6-103:20.  Based on the foregoing, the jury could reasonably infer that these companies took licenses because they considered the '738 Patent valuable.[2]

### b.   Dr. Goldhabor-Gordon's Flawed Methodology Does Not Overcome the Objective Indicia of Nonobviousness

Dr. Goldhabor-Gordon's testimony regarding the obviousness of the '738 Patent, as well as the jury's factual findings based thereon, are insufficient to overcome the strong indicia of nonobviousness.  Dr. Goldhabor-Gordon failed to consider each *Graham* factor and failed to address (1) whether a POSITA at the time of the invention would have been motivated to modify the prior art to reach the claimed invention; and (2) whether a POSITA would have had a reasonable expectation of success in doing so.

---

[2] LHC argues that the evidence does not support the verdict because the licensees themselves did not testify at trial regarding their motivations.  But LHC offers no authority such direct evidence is required and the jury was specifically instructed that it may consider circumstantial evidence.  *See* D.I. 472, Day 1 Trial Tr. at 125:22-126:8.

1   Dr. Goldhabor-Gordon failed to consider the objective indicia of nonobviousness
2   which, as discussed, must be considered for a proper obviousness analysis.  *See supra* at
3   §§ II.B.1.b-c (citing cases), II.B.2.a.   Critically, LHC declined at trial to recall Dr.
4   Goldhabor-Gordon to rebut Dr. Fitzgerald's objective indicia analysis, even though it was
5   LHC's right to do so.  *See* D.I. 472, Day 1 Trial Tr. at 140:17-20 (instructing jury that
6   "Lowes will have the option to put on 'rebuttal' evidence to any evidence offered by
7   Epistar on the validity of the asserted claims of the patents").  Dr. Goldhabor-Gordon's
8   incomplete analysis renders his opinions and conclusions defective.  Dr. Fitzgerald, by
9   contrast, considered each *Graham* factor in rendering his ultimate opinion that the claims
10  of the '738 Patent were not obvious.  *See* D.I. 467, Day 7 PM Trial Tr. at 98:2-113:23.

11  Dr. Goldhabor-Gordon also failed to properly consider whether a POSITA would
12  have been motivated to modify or combine any of the references to reach **the claimed**
13  **invention** and would have had a reasonable expectation of success in doing so.  *See Apple*
14  *Inc. v. INVT SPE LLC*, 851 F. App'x 200, 203 (Fed. Cir. 2021) (no obviousness because
15  no motivation to combine); *Adidas AG v. Nike, Inc.*, 963 F.3d 1355, 1358 (Fed. Cir. 2020)
16  (same); *Intendis GmbH v. Glenmark Pharm. Inc.*, 822 F.3d 1355, 1360 (Fed. Cir. 2016)
17  (no obviousness because no reasonable expectation of success).   LHC offers only
18  conclusory arguments and non-sequiturs regarding these required elements for both the
19  Oohata '090 and the Oohata '741 references (collectively, "Oohata References").

20  LHC argues that its expert, Dr. Goldhaber-Gordon, established a reason to modify
21  the Oohata References based on a generic desire to connect LEDs to power.  Mot. at 4-5
22  (citing D.I. 466, Day 6 PM Trial Tr. at 49:12-50:4).[3]  This is irrelevant because the claims
23  do not concern any power connections, and Dr. Goldhabor-Gordon does not address the
24  required legal question: whether a POSITA would have been motivated to to achieve the
25  **specific** connections referenced in the claims.  Dr. Goldhaber-Gordon's opinion that a
26
27      [3] Citations to "Mot." refer to LHC's "Combined Memorandum in Support of Its Trial
28  and Post-Trial Motions." (D.I. 485).

POSITA would have been motivated "to connect LEDs together" (D.I. 466, Day 6 PM Trial Tr. at 49:14-50:4) is conclusory, vague, and untethered to the claimed invention. Such opinion does not address the claimed invention, which requires electrically connecting "epitaxial light-emitting stack layers disposed on the adhesive layer," not simply any LED. *See* Trial Ex. 4 ('738 Patent) at claim 1; *ActiveVideo Networks, Inc. v. Verizon Communs., Inc.*, 694 F.3d 1312, 1328 (Fed. Cir. 2012) (generic testimony on motivation to combine insufficient where it "bears no relation to any specific combination of prior art elements" and "fails to explain why a [POSITA] would have combined elements from specific references in the way the claimed invention does").

Dr. Goldhabor-Gordon also failed to address or rebut Dr. Fitzgerald's opinions that a POSITA would not have been motivated to modify the Oohata References because they do not discuss the heat dissipation problems that the '738 Patent sought to solve (*see supra* at § II.B.2.a.i.), but are instead directed to solving a ***different*** problem altogether – namely, an LED display that overcomes the flaws inherent in legacy liquid crystal and plasma displays. *See* D.I. 467, Day 7 PM Trial Tr. at 101:3-10. Dr. Fitzgerald further testified—and Dr. Goldhabor-Gordon did not rebut—that because the Oohata References were concerned with LED displays, the interconnections between individual LEDs were very different and not the sort of connections a POSITA would have looked to in trying to solve the problems addressed by the '738 Patent. *See id.* at 102:23-103:6, 104:11-15 (no motivation to electrically connect individual light-emitting pyramids because "you have to address each pixel individually, so you do not want them connected to each other."), 109:8-110:5. In short, Dr. Fitzgerald offered unrebutted testimony that the Oohata References ***taught away*** from the '738 Patent. *See AstraZeneca AB v. Mylan Pharms. Inc.*, No. 2021-1729, 2021 U.S. App. LEXIS 36127, at *25 (Fed. Cir. Dec. 8, 2021) (prior art "teach[es] away from the claimed invention if a skilled artisan upon reading the reference, would be discouraged from following the path set out in the reference").

LHC also failed to offer any evidence that a POSITA would have any reasonable

expectation of success in modifying the Oohata References to arrive at the specific
claimed invention.  Dr. Goldhabor-Gordon offered no opinion or testimony on this
element of the test.  Instead, LHC implies a reasonable expectation of success based on
*unrelated* testimony that "the ***idea*** of parallel and series circuits is something that is often
taught in high school classes."  D.I. 466, Day 6 PM Trial Tr. at 31:22-32:5.  Any such
"idea" could not satisfy this element of the test, because Dr. Goldhaber-Gordon himself
testified that a POSITA would have "a bachelor's degree in material science or electrical
engineering and at least two years of experience related to the design of solid-state light-
emitting devices."  *See id.* at 53:22-54:54:2.  Indeed, whatever may be known about
parallel and series circuits hardly qualifies as evidence that a POSITA would have had a
reasonable expectation of success in modifying the Oohata References to arrive at the
*claimed inventions* in the '738 Patent.  Moreover, Dr. Goldhaber-Gordon testified only
that a POSITA might have "gone about" making the modifications, not that she would
have a reasonable expectation of success in doing so.  *See id.* at 31:22-32:13.

By contrast, Dr. Fitzgerald specifically testified that a POSITA would not have had
a reasonable expectation of success in modifying the Oohata References because the
circuitry relied upon by the references was incompatible with circuitry needed to create
the claimed invention.  *See* D.I. 467, Day 7 PM Trial Tr. at 104:23-105:9 ("It turns out
the circuitry for display to form an image you have to be able to address each pixel . . . so
you can't just have diodes.  So if you try to achieve the goal of making a display only
connecting diodes together, you cannot form images.").

Dr. Goldhabor-Gordon additionally failed to show either a motivation to combine
or a reasonable expectation of success for LHC's second asserted combination involving
the Oohata References, namely Oohata '741 + Marchl + Sickmiller.  LHC concedes that
Dr. Goldhabor-Gordon testified that a POSITA would only have been motivated to
combine Oohata '741 with the Sickmiller reference (and not Marchl).  *See* Mot. at 6; D.I.
466, Day 6 PM Trial Tr. at 50:7-13.  By failing to provide a reason that a POSITA would
have been motivated to combine ***all three*** references, the only reasonable inference is that

1    he engaged in improper hindsight. *See Innogenetics*, 512 F.3d at 1374 n.3 ("[w]e must

2    still be careful not to allow hindsight reconstruction of references to reach the claimed

3    invention without any explanation as to how or why the references would be combined to

4    produce the claimed invention.").

5              Indeed, such improper use of hindsight is further evidenced by Dr. Goldhabor-

6    Gordon's testimony specifically defining the motivation to combine based on the '738

7    Patent's described solution of using transparent substrates. *See* D.I. 466, Day 6 PM Trial

8    Tr. at 50:5-17 (testifying that a reason to combine the references was based on use of

9    "transparent substrate"); Trial Ex. 4 ('738 Patent) (33 separate references to

10   "transparent"). Dr. Goldhabor-Gordon never testified that the desire to use transparent

11   substrates came from any known problem in the field or anywhere ***other than the '738***

12   ***Patent itself***. Notably, in arguing for a motivation to combine, LHC's also relies entirely

13   on testimony from Dr. Goldhabor-Gordon using the teachings of the claims and

14   specification of the '738 Patent itself. *See* Mot. at 6 (citing D.I, 466, Day 6 PM Trial Tr.

15   47:15-48:10). Such reliance on the '738 Patent's solution (*i.e.*, transparent substrates) to

16   choose prior art is improper hindsight. *See Millennium Pharms.*., 862 F.3d at 1367 ("[t]he

17   inventor's own path itself never leads to a conclusion of obviousness; that is hindsight.");

18   *Insite Vision Inc. v. Sandoz, Inc.*, 783 F.3d 853, 859 (Fed. Cir. 2015) ("Defining the

19   problem in terms of its solution reveals improper hindsight in the selection of the prior

20   art.").

21             Finally, Dr. Goldhabor-Gordon offered no opinion on any reasonable expectation

22   of success in combining Oohata '741 with Marchl and Sickmiller. This stands in stark

23   contrast to the testimony of Dr. Fitzgerald, who specifically opined that a POSITA could

24   not have been motivated (or had a reasonable expectation of success) to combine these

25   three references because they "have several differences which are incompatible from

26   function to structure to how you make them." D.I. 467, Day 7 PM Trial Tr. at 111:17-

27   112:14 ("[t]he way you would put these together are completely different processes").

28   Dr. Goldhabor-Gordon did not rebut Dr. Fitzgerald's testimony.

1    For the foregoing reasons, the Court should deny LHC's Motion and enter

2    judgment for Epistar on the nonobviousness of the '738 Patent.

3              **3.    The '780 Patent Is Not Obvious**

4         The Court should enter judgment that the asserted claims of the '780 Patent are not

5    obvious.  As an initial point, the jury determined that LHC's asserted combination was

6    non-analogous and not within the scope of the '780 Patent's prior art, foreclosing any

7    finding of obviousness.  *See* Dkt. 455 at 6; *Airbus S.A.S. v. Firepass Corp.*, 941 F.3d 1374,

8    1379 (Fed. Cir. 2019) (a "reference qualifies as prior art for an obviousness determination

9    only when it is analogous to the claimed invention").  Moreover, the jury determined that

10   many differences existed between each individual reference which, as discussed below,

11   raise doubts about the possibility of making the asserted combination.  *See* Dkt. 455 at 6.

12   Finally, the jury's determination that the '780 Patent solved a long-felt need also

13   forecloses obviousness.

14             **a.    Ferguson's Use of Non-Analogous Art Shows Hindsight**

15        The jury found Dr. Ferguson's asserted combination to include a non-analogous

16   reference (Sugiura) that is outside the scope of the '780 Patent's prior art.  *See* D.I. 455 at

17   5-6.  Dr. Ferguson's reliance on such non-analogous art demonstrates his use of improper

18   hindsight in two ways.  *First*, by relying on a reference outside the scope of the '780's

19   prior art, Dr. Ferguson was not placing himself in the shoes of a POSITA.  *See Pentec,*

20   *Inc. v. Graphic Controls Corp.*, 776 F.2d 309, 313 (Fed. Cir. 1985) (POSITA presumed

21   to know of **analogous** art).  *In re Kahn*, 441 F.3d 977, 987 (Fed. Cir. 2006) (defining

22   relevant prior art "is meant to defend against hindsight.").

23        *Second*, Dr. Ferguson offered no reason why a POSITA would be motivated to

24   combine Nakamura and Sugiura or would have a reasonable expectation of success in

25   doing so.  Dr. Ferguson's failure to address these requirements is particularly troubling

26   given the jury's finding that significant differences between Nakamura and Sugiura exist.

27   *See* D.I. 455 at 5-6.  These differences suggest an increased difficulty in combining

28   references which Dr. Ferguson failed to address altogether.  *See Univ. of Strathclyde v.*

*Clear-Vu Lighting LLC*, No. 2020-2243, 2021 U.S. App. LEXIS 32872, at *15 (Fed. Cir. Nov. 4, 2021) ("Obviousness cannot be based on the hindsight combination of components selectively culled from the prior art to fit the parameters of the patented invention."); *TQ Delta, LLC v. Cisco Sys., Inc.*, 942 F.3d 1352, 1361 (Fed. Cir. 2019) (unsupported expert testimony risks "hindsight bias"); *OSI Pharms.*, 939 F.3d at 1385 (hindsight where no reasonable expectation of success given); *Innogenetics*, 512 F.3d at 1374 n.3 (hindsight where no reason to combine given).

### b. The Jury's Finding That the '780 Patent Solved a Long-Felt Need Forecloses Obviousness.[4]

The jury also found that the '780 Patent solved a long-felt need in the industry, further disproving LHC's obviousness claim. *See* Dkt. 455 at 6. The basis for the jury's finding is not credibly disputed by LHC.[5] Indeed, both parties' experts agreed that the '780 Patent was concerned with resolving a particular known problem in the field called "total internal reflection," or TIR. *See* D.I. 462, Day 2 PM Trial Tr. at 79:10-23; D.I. 478, Day 7 AM Trial Tr. at 32:24-33:2; D.I. 467, Day 7 PM Trial Tr. at 12:4-13:14, 115:4-21, 120:16-121:1; Trial Ex. 3 at 1:55-62. TIR is related to the reduction in light extraction efficiency. *See id.* However, while Dr. Fitzgerald testified precisely how the '780 Patent's solution to this long-felt need demonstrated the nonobviousness of the patent (D.I. 467, Day 7 PM Trial Tr. at 115:4-21), Dr. Ferguson offered no opinions on this issue or any other objective indicia of nonobviousness. Dr. Fitzgerald's unrebutted testimony strongly shows nonobviousness.

Moreover, Dr. Ferguson's failure to consider the objective indicia of nonobviousness taints his entire obviousness analysis. As previously discussed above, it

---

[4] Although the jury found that the objective factor regarding licensing applied to the '780 Patent, Epistar does not contend that any of the license agreements in evidence in this case pertains to the '780 Patent and does not maintain this objective factor.

[5] LHC argues (incorrectly) that "evidence relied upon and the jury's finding match the record for the '738 Patent . . . and should be rejected for the same reasons" but otherwise ignores the jury's finding of long-felt need. Mot. at 17.

is error not to consider every *Graham* factor, especially the objective indicia when presented. *See supra* at §§ II.B.1.b-c. Dr. Ferguson's analysis and conclusions on obviousness are unreliable for the same reasons as Dr. Goldhabor-Gordon's incomplete '738 analysis discussed above. *See supra* at §§ II.B.2.b.

### c. LHC Is Not Entitled to JMOL or a New Trial

LHC's motion for JMOL or a new trial should be denied because the jury's factual findings are (1) supported by substantial evidence; (2) not contrary to the clear weight of the evidence; and (3) not evident of any miscarriage of justice.

The jury's finding that Sugiura was not prior art to the '780 Patent was supported by substantial evidence. Both parties' experts agreed that Sugiura "was about laser cutting" of silicon wafers and other devices, not about the design of an LED. D.I. 478, Day 7 AM Trial Tr. at 59:15-23; D.I. 467, Day 7 PM Trial Tr. at 116:1-7. However, while Dr. Ferguson offered no testimony as to whether Sugiura was within the scope of the '780 prior art, Dr. Fitzgerald explained in detail why it was ***not***. Specifically, Dr. Fitzgerald explained that a POSITA would not look to Sugiura to solve the problem of TIR (that both experts agreed that was the central to the '780 Patent). Dr. Fitzgerald testified that Sugiura was instead focused on issues pertaining to laser cutting (not LED design). *See* D.I. 467, Day 7 PM Trial Tr. at 116:1-13. After analyzing both the '780 Patent's file history and Sugiura itself, he concluded that Sugiura was not within the scope and content of the prior art and that a POSITA would not be motivated to combine Sugiura with Nakamura. *See id.* at 114:19-116:13, 117:21-118:17. This detailed analysis is more than adequate to sustain the jury's verdict under the standard for either a JMOL or new trial motion.

LHC offers several arguments for why the jury's verdict should be overturned, but none of these arguments are meritorious. For example, LHC attempts to undercut the jury's factual findings by arguing that LHC presented "relevant evidence." Mot. at 13-14. This attempt to reargue the merits erroneously misapprehends the legal standards for JMOL and new trial and should be rejected out of hand. *See Metabolite Labs., Inc. v.*

*Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1359 (Fed. Cir. 2004) (JMOL requires lack of substantial evidence supporting verdict); *Bright Harvest Sweet Potato Co. v. H.J. Heinz Co., L.P.*, 760 F. App'x 537, 540 (9th Cir. 2019) (new trial warranted only to prevent a miscarriage of justice).

LHC also argues that a generic concept regarding "wastage" establishes that Sugiura is within the scope of the '780 prior art. But LHC proffered no evidence regarding this in its case in chief. Indeed, Dr. Ferguson never even mentioned the word "wastage" in his testimony, let alone opine that it was a known problem in the field of the '780 Patent at the time of the invention. LHC's reliance on out-of-context cross examination testimony of Dr. Fitzgerald is equally specious – Dr. Fitzgerald likewise never testified that wastage was a known problem in the field or one that a POSITA would consider relevant. D.I. 467, Day 7 PM Trial Tr. at 162:17-163:5.

LHC further argues that any failure to relate Sugiura to the '780's goal of reducing TIR is irrelevant. Mot. at 15. LHC raised this argument during trial, and the Court has already rejected it. *See* D.I. 467, Day 7 PM Trial Tr. at 88:9-92:8. Moreover, the argument is a non-sequitur: as discussed above, LHC failed to proffer any evidence in its case-in-chief that Sugiura was within the scope and content of the prior art. The jury appropriately found that LHC failed to carry its burden of proof on this issue. LHC's criticism of Dr. Fitzgerald's detailed analysis is both irrelevant and legally specious. *Unwired Planet, LLC v. Google Inc.*, 841 F.3d 995, 1001 (Fed. Cir. 2016) ("To determine if art is analogous, we look to the purposes of both the invention and the prior art.").

For the foregoing reasons, the Court should deny LHC's Motion and enter judgment for Epistar on the nonobviousness of the '780 Patent.

### C.  LHC Is Not Entitled to JMOL or a New Trial on Infringement of the '780 Patent and/or Representativeness

#### 1.  Given Dr. Fitzgerald's and EAG's Analysis, There Is More Than Substantial Evidence Supporting the Jury's Verdict.

At trial, Dr. Fitzgerald testified in detail about his methodology. *See* D.I. 462, Day 2 PM Trial Tr. 82:22-84:17, 86:4-99:8; D.I. 474, Day 3 AM Trial Tr. 19:10-25:4, 29:11-

36:8; *see also* Trial Exs. 105, 1184-88, 1190-91, 1837-41, 1844-45, 1850; *see also* Mays Decl., Ex. A (video shown to jury demonstrating physical examination).  After physically examining ***each*** accused product, Dr. Fitzgerald selected certain products for further analysis and representativeness evaluation with an esteemed laboratory known as EAG, whose reputation, experience, and credentials LHC never challenged.  *See* D.I. 462, Day 2 PM Trial Tr. 82:22-84:17, 86:4-99:8; D.I. 474, Day 3 AM Trial Tr. 19:10-25:4, 29:11-36:8; *see also* Trial Exs. 105, 1184-88, 1190-91, 1837-1841, 1843-1845, 1850, and 1852. As detailed in Epistar's opposition to LHC's *Daubert* motion, Dr. Fitzgerald laboriously determined that the identification of representative products would be feasible and practical by analyzing model numbers; personally inspecting the structure of each bulb; ordering detailed laboratory analysis from EAG, which included the use of scanning electron microscopy, transmission electron microscopy, x-ray diffraction microscopy, and optical microscopy; and examining EAG's testing analysis for any material differences among the bulbs.  *See* Trial Exs. 105, 1184-1188, 1190, and 1191.

After explaining his methodology to the jury, Dr. Fitzgerald provided an element-by-element analysis showing how—using EAG's laboratory analysis—each accused product infringed each asserted claim of the '780 Patent.  *See* D.I. 474, Day 3 AM Trial Tr. 36:9-54:9; D.I. 467, Day 7 PM Trial Tr. 128:24-130:18; *see also* Trial Exs. 3, 105, 1184-88, 1190-91, 1836-41, 1843-45, 1850, 1852; *see also* Mays Decl., Ex. B (Dr. Fitzgerald's demonstrative slides) at 66-82.  This evidence is sufficient to sustain the jury's verdict.

### 2.   LHC's Motion Is an Improper Motion for Reconsideration

LHC argues that it is entitled to either JMOL or a new trial because it contends that Dr. Fitzgerald's testimony was not based on a sound methodology.  LHC imports the same arguments from its *Daubert* motion, making this Motion an improper motion for reconsideration.  *See* Mot. at 11-12; D.I. 278 at 7-22; D.I. 303 at 5-9; L.R. 7-18.  As the Court previously determined, LHC's arguments go to the weight, not the admissibility, of Dr. Fitzgerald's testimony, and reweighing the evidence is improper at this stage of the

case. *William Inglis & Sons Baking Co.*, 668 F.2d at 1026  (may not reweigh evidence on JMOL).  LHC improperly asks the Court to disregard unfavorable evidence to it, such as the fact that its own expert testified that "substantially flat" areas remain so despite the types of alleged imperfections referenced by LHC.  *See* D.I. 467, Day 7 PM Trial Tr. at 42:13-16.

With respect to Dr. Fitzgerald's representativeness methodology (for which LHC seeks only JMOL and not a new trial), the Court already denied LHC's *Daubert* motion based on, among other reasons, the specific grounds raised here.  *Compare* Mot. at 11-12 *with* D.I. 303 at 3-5.[6]  In so doing, the Court found that Dr. Fitzgerald performed a detailed analysis wherein he physically inspected ***each*** accused product and then selected products to test for representativeness based on that inspection.  *See supra* at § II.C.1 (describing methodology in detail and citing evidence).  Dr. Fitzgerald's testimony and analysis satisfy the substantial evidence standard for JMOL.

### D.    LHC Is Not Entitled to JMOL or a New Trial on the '771 Patent

LHC premises its request for JMOL or a new trial on the validity and infringement of the '771 Patent on wholly untenable bases.  LHC challenges testimony *elicited through LHC's own examination*, to which only Epistar—***not LHC***—objected as outside the scope of direct examination.  *See* D.I. 475, Day 4 AM Trial Tr. at 64:3-20, 64:22-68:18, 69:1-70:8; *see also* Mot. at 18 (citing same).  LHC can hardly be heard to complain about answers Dr. Fitzgerald gave to LHC's own questions, especially absent an on-the-record objection.  *See Apple Inc. v. Samsung Elecs. Co.*, No. 11-cv-01846-LHK, 2016 U.S. Dist. LEXIS 17596, at *79 (N.D. Cal. Feb. 10, 2016) (waiver of objection to testimony that "Apple did not object to . . . at trial").  Further, as discussed below, LHC's arguments also

---

[6] LHC's argument that Dr. Fitzgerald "failed to establish that scientists in the field would have considered 'chip configuration' a sufficient basis to determine feature on the sides and top of a chip" was not raised in its *Daubert* motion and should therefore be considered waived.  *See* D.I. 278 at 7-19; D.I. 277; D.I. 382 (finding waiver of arguments not raised in LHC's *Daubert* motion).

fail on the merits.

### 1.   LHC Is Not Entitled to JMOL or a New Trial on Infringement

LHC's arguments on infringement are deficient.  First, LHC claims that the jury's verdict cannot be sustained if the Court were to disregard the above-referenced testimony. Mot. at 19.  This is wrong – LHC's argument ignores the significant evidence of infringement in the record beyond the testimony it now challenges.  *See* D.I. 474, Day 3 AM Trial Tr. 54:10-74:11; 80:13-88:21; D.I. 467, Day 7 PM Trial Tr. 128:24-130:18; Trial Exs. 5, 105, 1184-88, 1190-91, 1833, 1837-1845, 1850, 1853-54.  Even if the Court were to disregard Dr. Fitzgerald's above-referenced testimony about his understanding of the ordinary meaning of the claim terms, there remains substantial evidence to sustain the jury's verdict.

Second, LHC argues that Dr. Fitzgerald was not permitted to testify regarding claim construction on the stand.  Mot. at 18-19.  But LHC itself opened the door (and did not object) to that testimony.   LHC also previously conceded that Dr. Fitzgerald was permitted to testify regarding his understanding of the plain and ordinary meaning of the claims.  *See* D.I. 339 at 2; *Hoist Fitness Sys., Inc. v. TuffStuff Fitness Int'l, Inc.*, No. ED CV 17-01388-AB(KKx), 2019 WL 6481307, at *4 (C.D. Cal. Aug. 27, 2019) (expert may explain "what his or her understanding of that plain and ordinary meaning is.").

Third, LHC argues that Dr. Fitzgerald applied an incorrect claim construction because "[i]n ordinary English 'distant' means further away than 'near.'" Mot. at 19.  It is LHC who is misapplying the law: a term's ordinary meaning is not the one ascribed in "ordinary English," but rather how that term is understood by a POSITA having read the patent and its file history.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (ordinary meaning means meaning to a POSITA); *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (same).  This was the standard Dr. Fitzgerald applied.  *See* D.I. 475, Day 4 AM Trial Tr. at 67:8-68:18 (referring multiple times to needing "the context").  Dr. Fitzgerald correctly recognized that in asking questions about "near," LHC's counsel was importing a term appearing in ***a different***

*patent* and therefore subject to different contexts. *See id.* at 68:4-18 ("in the context of
the *other* patent"); Trial Ex. 5 ('771 Patent) ("near" never appears in claim language).
Given this, the jury was perfectly within its right to discredit LHC's argument on this
issue.

### 2.    LHC's Untimely Indefiniteness Defense Is Flawed

Months after the conclusion of trial, LHC's Motion advances an entirely new
indefiniteness defense, which it never presented during trial and had waived even before
trial. Notably, on June 29, 2020, LHC sent Epistar a communication expressly limiting
its invalidity defenses to only prior art invalidity under 35 U.S.C. §§ 102 and 103, *not*
indefiniteness under § 112. *See* Mays Decl. Ex. C.

Even if the Court were to permit LHC to renege on its agreement and consider a
defense that it never presented during trial, the defense fails on the merits. Neither Dr.
Ferguson nor Dr. Fitzgerald ever opined that any term in the '771 Patent was indefinite.[7]
Indeed, both parties' experts had no difficulty applying the term "distant" in both the
infringement and invalidity contexts. *See* D.I. 478, Day 7 AM Trial Tr. at 47:23-49:2,
72:3-73:15; *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1380 (Fed. Cir. 2017)
(holding that application of claim term by experts "provide[s] evidence that a skilled
artisan did understand the scope of this invention with reasonable certainty."). And,
although LHC challenges Dr. Fitzgerald's interpretation of the plain and ordinary
meaning of the terms in the '771 claims, it ignores that Dr. Fitzgerald was able to offer a
clear explanation for the meaning of the term based on his review of the specific language
in the claims of the '771 Patent. *See* Mot. at 20; D.I. 475, Day 4 AM Trial Tr. at 64:3-
66:7 ("It tells you in the patent in the context, right, being distant from said outer side
faces and inclined to said semiconductor layers, LED light propagating in the

---

[7] Epistar never argued that "near" or "distant" suggested indefiniteness. Rather,
Epistar objected to a slide in LHC's opening demonstratives because LHC's specific use
of those terms in that slide were divorced from any claim language or context, rendering
the slide vague and (more importantly) argumentative. See D.I. 411 at 2.

semiconductor structure being diverted at light extraction faces. So as long as that -- it has to be distant enough for that process to happen."), 67:8-14, 68:4-18, 69:2-21.  For the foregoing reasons, LHC is not entitled to either JMOL or retrial on infringement or validity of the '771 Patent.[8]

### E.    The Court Should Not Vacate or Remit the Jury's Damages Award

LHC's Motion seeks a drastic remedy in requesting that the Court reject the jury's damages verdict, set the damages award to zero, grant remittitur, or hold a new trial.  Mot. at 20.  There is no basis for LHC's request.  "A jury's damages award must be upheld unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork."  *Bayer HealthCare LLC v. Baxalta Inc.*, 989 F.3d 964, 984 (Fed. Cir. 2021).  Further, a jury is "entitled to choose a damages award within the amounts advocated by the opposing parties" and is "not bound to accept a rate proffered by one party's expert but rather may choose an intermediate royalty rate." *Id.* at 983.  LHC does not come close to meeting the required standards or demonstrating that there should be a new trial.

### 1.    Apportionment by Comparable Licenses Is Proper

There is no dispute that apportionment based on comparable licenses (the method employed by Epistar at trial) is an accepted methodology.  *See* Mot. 21-22; *Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014) ("licenses may be presented to the jury to help the jury decide an appropriate royalty award"); *Monsanto Co. v. McFarling*, 488 F.3d 973, 978 (Fed. Cir. 2007) ("An established royalty is usually the best measure of a 'reasonable' royalty for a given use of an invention....").  When a sufficiently comparable license is used as the basis for determining the appropriate royalty, "further apportionment may not necessarily be required" because "a damages theory that is

---

[8] LHC's cases are inapposite.  None of the cases stands for the proposition that an indefiniteness defense may stand where both experts have clearly applied a term. Moreover, LHC cites irrelevant cases pertaining to lack of enablement, not indefiniteness.

dependent on a comparable license (or a comparable negotiation) may in some cases have built-in apportionment." *Vectura Ltd. v. GlaxoSmithKline LLC*, 981 F.3d 1030, 1040 (Fed. Cir. 2020):

> Built-in apportionment effectively assumes that the negotiators of a comparable license settled on a royalty rate and royalty base combination embodying the value of the asserted patent. As the district court noted, a party relying on a sufficiently comparable license can adopt the comparable license's royalty rate and royalty base without further apportionment and without proving that the infringing feature was responsible for the entire market value of the accused product.

*Id.* at 1041.

"Assessing the comparability of licenses requires a consideration of whether the license at issue involves comparable technology, is economically comparable, and arises under comparable circumstances as the hypothetical negotiation." *Bio-Rad Labs., Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1372-73 (Fed. Cir. 2020). As the Federal Circuit noted in *Bio-Rad*, when a party meets a showing of "baseline comparability," the "degree of comparability is a factual issue best addressed through cross examination" and "left for the jury to decide." *Id.* at 1374. Indeed, prior licenses "are almost never perfectly analogous to the infringement action." *Ericsson,* 773 F.3d at 1227. They "may cover more patents than are at issue in the action, include cross-licensing terms, cover foreign intellectual property rights, or, as here, be calculated as some percentage of the value of a multi-component product." *Id..* "[T]he fact that a license is not perfectly analogous generally goes to the weight of the evidence, not its admissibility." *Id.*; *see also Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1326 (Fed. Cir. 2014); *ActiveVideo Networks*, 694 F.3d at 1333.

LHC relies heavily on *Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361 (Fed. Cir. 2021) ("*Omega II*") in arguing that Mr. Van Uden's damages opinions are improper. However, *Omega II* is distinguishable on a number of grounds. First, *Omega II* involved a case where both the plaintiff and its expert stated that ***every*** patent in Omega's portfolio

1   was valued the same. *Id.* at 1379.  As discussed below, Mr. Van Uden specifically offered

2   a patent-by-patent analysis.  Second, the Federal Circuit found that Omega's expert made

3   no showing of comparability between the hypothetical negotiation and the licenses on

4   which the expert relied.  *Id.* at 1379-81.  Here, however, both sides agree the relevant

5   license agreements are comparable, and Mr. Van Uden specifically considered the

6   distinguishing features between those agreements and the hypothetical negotiation.  *See*

7   *Ericsson*, 773 F.3d at 1227; Trial Exs. 37, 38, 41; D.I. 473, Day 2 AM Tr. at 75:6-17,

8   76:13-17, 78:7-22, 82:22-83:2, 90:8-21, 92:2-4, 93:9-15; D.I. 474, Day 3 AM Tr. at

9   52:22-53:10; D.I. 463, Day 3 PM Tr. at 9:12-11:4; D.I. 475, Day 4 AM Tr. at 121:18-

10  122:25; D.I. 464, Day 4 PM Tr. at 24:6-62:12; Day 5 AM Tr. at 38:6-41:16, 86:10-91:2;

11  D.I. 477, Day 6 AM Tr. at 87:23-89:5.

12              **2.      LHC Is Not Entitled to Vacatur or a New Trial on Damages**

13          As a preliminary matter, LHC's Motion seeks a legal impossibility.  The Court

14  cannot award ***zero*** damages, because Epistar is entitled to no "less than a reasonable

15  royalty for the use made of the invention by the infringer." 35 U.S.C. § 284.  LHC, having

16  been adjudged an infringer, cannot escape liability.[9]

17          The Court should further deny LHC's request for vacatur or a new trial on damages

18  because the jury's verdict was supported by substantial evidence and not contrary to the

19  clear weight of the evidence.  LHC ignores the controlling legal standards for either JMOL

20  or a new trial, and instead seeks to relitigate the merits of the case.  However, the jury's

21  findings on damages—less than the full amount requested by Epistar—demonstrate that

22

23          [9] LHC relies on *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1292 (Fed. Cir. 2020), to

24  support its claim for zero damages.  That case is distinguishable.  There, the Federal

25  Circuit determined that the patentee's sole damages theory was one for indirect

26  infringement, whereas the jury found infringement only under a direct infringement

27  theory.  *See id.* ("Sales of [accused product], therefore, cannot be a measure of damages

28  for direct infringement by Adobe—sales could serve here as a measure of damages only
    for TecSec's indirect infringement theory . . . But the jury found no indirect
    infringement.").

1    it in fact weighed and considered the evidence.

2                    **a.    Epistar Did Not Fail the Apportionment Requirement**

3    The Court instructed the jury that it may consider comparable licenses, including

4    Epistar's licensing evidence.  *See* D.I. 479, Day 8 Trial Tr. at 24:3-9 ("Some of the factors

5    you may consider in making your determination are . . . comparable license agreements

6    such as those covering the use of the claimed invention or similar technology"); 25:25-

7    26:5.  In considering the different rates presented in the comparable licenses, the jury

8    ultimately awarded a royalty less than what Epistar asked for at trial.  *See* D.I. 455 and

9    456.  This finding is supported by substantial evidence.

10   During trial, Epistar presented evidence concerning three license agreements:

11   Super Trend, QLS, and Adamax.  *See* Trial Exs. 37, 38, 41.  Each of these license

12   agreements involved at least two of the patents-in-suit and was directed to the same

13   technology (LED filament bulbs) as the accused products.  *See* Trial Exs. 37 at 1.3 and

14   Ex. A, 38 at 1.3 and Ex. A, 41 at 1.3 and Ex. A; D.I. 464, Day 4 PM Tr. at 39:15-40:24,

15   42:7-43:17, 44:23-47:20.  Further, Epistar's expert Dr. Fitzgerald analyzed the unasserted

16   patents in each license agreement and opined that they pertained to the same general

17   technology as the patents-in-suit.  *See* D.I. 474, Day 3 AM Tr. at 52:22-53:10; D.I. 475,

18   Day 4 AM Tr. at 121:18-122:25; D.I. 464, Day 4 PM Tr. at 33:16-35:16; *see also* D.I.

19   464, Day 4 PM Tr. at 40:25-41:9, 43:5-17, 47:7-20; D.I. 476, Day 5 AM Trial Tr. at 90:9-

20   16.  Epistar also presented evidence concerning the licensing program of a third-party

21   LED manufacturer, Philips.  As with the Epistar agreements, both parties' experts relied

22   on the Philips licensing program in their respective analyses.  D.I. 464, Day 4 PM Tr. at

23   39:7-14, 50:13-52:20; D.I. 477, Day 6 AM Tr. at 58:23-59:25.

24   Critically, although they advocated different rates, both parties' experts agreed that

25   the three Epistar licenses were sufficiently comparable to the hypothetical negotiation to

26   be used in devising a reasonable royalty rate.  D.I. 464, Day 4 PM Tr. at 39:7-50:12; D.I.

27   477, Day 6 AM Tr. at 87:23-89:5; Trial Exs. 37, 38, 41.  And, although they drew different

28   conclusions, they also both relied on the Philips licensing program.  There is thus no

credible dispute that the three Epistar licenses presented to the jury *were* sufficiently comparable to the hypothetical negotiation, and that those licenses, along with the Philips licensing program, constitute substantial evidence to support the jury's verdict. *See Coleman Co.. v. Team Worldwide Corp.*, No. 2:20-cv-351, D.I. 227 (E.D. Va. Jan. 31, 2022) (once baseline of comparability is met, precise differences "go to the testimony's weight."). The inquiry ends here.

Indeed, LHC does not dispute the foregoing. Instead, it seeks to relitigate the merits by focusing on distinguishing features of the various license agreements. LHC essentially suggests that the jury should have credited Dr. Vander Veen's testimony and discredited Mr. Van Uden's. Since there is no dispute that the license agreements *can* be considered (and the only dispute concerns the degree to which they should be relied upon), LHC's critiques go to the weight of the evidence. *Ericsson*, 773 F.3d at 1227; *Apple*, 757 F.3d at 1326; *ActiveVideo*, 694 F.3d at 1333. It is the jury's province to weigh the evidence.

Even on the merits, however, LHC's arguments fail to establish that LHC is entitled to JMOL of zero damages. First, LHC argues that Epistar's license agreements did not vary based on the number of patents included. Mot. at 23. This is a non-sequitur. LHC offers no legal authority holding that each of a patentee's licenses must vary based on the number of patents to be comparable. Rather, this is simply an issue that the jury should take into consideration when weighing the evidence. *See Ericsson*, 773 F.3d at 1227.

Critically, Mr. Van Uden factored into his analysis several distinctions between the comparable licenses and the hypothetical negotiation. He considered the impact of the number of patents in each agreement but did not attribute significant weight to this particular distinction.[10] D.I. 464, Day 4 PM Tr. at 52:21-53:16. He based this opinion on two facts: (1) that royalty rates for comparable agreements in the industry—namely

---

[10] Mr. Van Uden also testified at length regarding his methodology in selecting comparable licenses. For example, he reviewed at least nine distinct Epistar license agreements, discarding six as non-comparable. D.I. 464, Day 4 PM Tr. at 39:4-14; D.I. 477, Day 6 AM Tr. at 88:16-89:5.

Epistar's license agreements and the Phillips licensing program—did not vary based on the number of patents; and (2) that *other* factors—such as the technical contributions of the licensed patents and the business relationship of the parties—appeared to be more relevant factors with respect to devising a royalty rate. *Id*.; Trial Ex. 1518 at EPISTAR 0009822 and 9825; D.I. 473, Day 2 AM Tr. at 75:6-17, 76:13-17, 78:7-22, 82:22-83:2, 90:8-21, 92:2-4, 93:9-15; D.I. 463, Day 3 PM Tr. at 9:12-11:4; D.I. 464, Day 4 PM Tr. at 33:16-35:16, 39:15-48:6, 49:25-52:20, 54:5-17; D.I. 476, Day 5 AM Trial Tr. at 90:9-16. When considering the business position of the licensees, Mr. Van Uden factored in that some licensees were customers of Epistar and another, Adamax, was an adverse litigant. D.I. 464, Day 4 PM Tr. at 39:15-48:6, 49:25-50:12, 54:5-17; D.I. 476, Day 5 AM Tr. at 86:10-91:2. Ultimately, in testimony that LHC itself elicited, Mr. Van Uden analyzed the appropriate royalty rate on a patent-by-patent analysis, opining this rate to range between 3-5% depending on the number of precise patents at issue, and the other considerations discussed above. *See* D.I. 476, Day 5 AM Tr. at 38:6-41:16, 90:9-16; D.I. 463, Day 3 PM Tr. at 9:12-11:4; D.I. 474, Day 3 AM Tr. at 52:22-53:10; D.I. 475, Day 4 AM Tr. at 121:18-122:25; D.I. 476, Day 5 AM Tr. at 41:10-16. Mr. Van Uden's analysis thus properly accounted and adjusted for the differences between the comparable licenses and the hypothetical negotiation and did not (as in *Omega II*) ignore them.

Next, LHC argues that Mr. Van Uden attributed no value to any other patents in the respective licenses. Mot. at 24-25. This is incorrect. Mr. Van Uden specifically testified that he did *not* attribute zero value to the other patents but determined (based on the technical analysis from Dr. Fitzgerald) that they were commensurate with the technology of certain of the asserted patents and provided similar value. *See* D.I. 476, Day 5 AM Trial Tr. at 90:9-16. Because Mr. Van Uden accounted for the differences between the licenses and the hypothetical negotiation (albeit in a different manner than LHC advocates), the jury was entitled to weigh the evidence, and there is no basis to

overturn the verdict.[11]

### b. The Verdict Is Not Inconsistent with the Trial Record

Lowe's argues that the jury's damages award must be vacated because it is not identical to either party's proffer.  Mot. at 27-28.  At the outset, Lowe's cites no legal authority for this position.  On the contrary, the jury is entitled to decide how to weigh the evidence it hears and what conclusion to draw from such evidence.  *See Bayer HealthCare*, 989 F.3d at 983 ("a jury is entitled to choose a damages award within the amounts advocated by the opposing parties and is not bound to accept a rate proffered by one party's expert but rather may choose an intermediate royalty rate."); *Corbrus, LLC v. 8th Bridge Capital, Inc.*, No. 2:19-cv-10182-CAS(AFMx), 2021 U.S. Dist. LEXIS 189204, at *10 (C.D. Cal. Aug. 9, 2021) ("the weight of each expert's testimony[] is for the jury to resolve at trial"). It was entirely within the province of the jury to select a damages award that draws from both parties' respective contentions.  And, since the verdict itself demonstrates that the jury considered and credited the opinions of both experts, the verdict must not be disturbed.

### c. Substantial Evidence Supports Using Net Sales

LHC also argues that because the royalty calculated using the net sales price of certain infringing bulbs as the royalty base *could exceed* the cost of the filaments contained in the bulbs, built-in apportionment must not apply.  Mot. at 28.  LHC cites no legal authority that supports overturning a reasoned damages award in this way.

LHC's argument is also circular.  As already demonstrated, LHC's expert *agrees* that the Epistar licenses considered by Mr. Van Uden are comparable.  As such, LHC has conceded built-in apportionment applies.  Because built-in apportionment assumes the parties to the comparable license settled on a royalty rate and royalty base combination

---

[11] Likewise, LHC's criticisms about Mr. Van Uden's discussions of a "chip/filament" distinction in the licensed patents and Epistar's policy of avoiding double charging its customers are equally directed to the weight of the evidence.  It was for the jury to weigh these considerations.  *See* Mot. at 24-25.

that embody the value of the patents, LHC's introduction of filament prices is a red herring. *Omega II*, 13 F.4th at 1377 (Built-in apportionment "assumes that the negotiators of a comparable license settled on a royalty rate and ***royalty base*** combination embodying the value of the asserted patent."). Indeed, consistent with the royalty base in the comparable agreements, ***both*** parties' experts relied on sales of filament bulbs, not filaments themselves. *See* D.I. 477, Day 6 AM Tr. at 63:4-66:20; D.I. 464, Day 4 PM Tr. at 41:22-42:6, 44:15-22, 48:1-6, 49:13-24, 50:19-51:9, 60:17-23; *see also* Trial Exs. 37 (at 1.3-1.4, 3.1), 38 (at 1.3-1.4, 3.1), and 41 (at 1.3-1.4, 3.1) (each relying on net sales of filament bulbs); Trial Ex. 1518 at EPISTAR 0009825.

## F.    LHC Is Not Entitled to JMOL on Willful Infringement

Substantial evidence supports the jury's verdict of willful infringement. In April 2017, Epistar sent LHC a notice letter that: (1) specifically alleged infringement ("Re: Infringement of Epistar's Patents"), identified a specific group of products ( "LED light bulbs"), provided an exemplary brand of accused products ("Utilitech"), and identified ***each*** asserted patent. *See* Trial Ex. 22.[12] As discussed in Epistar's post-trial motion for enhanced damages, LHC's witnesses admitted that upon receiving this letter, LHC took no action to investigate either the infringement allegations or a potential invalidity defense. *See* D.I. 486-1 at 2-3; D.I. 425-1 (Dep. Tr. excerpt of Mark Beck, LHC's 30(b)(6) witness) at Clip 25. LHC also never investigated Epistar's allegations with the accused products' manufacturer (Yankon), even though LHC and Yankon executives personally met in China months after the filing of the lawsuit. *See* D.I. 486-1 at 2-3; D.I. 425-2 (Dep. Tr. excerpt of Christopher Brown) at Clip 37 (107:1-13). LHC admitted it

---

[12] This is what the law requires for notice. *See Funai Elec. Co. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1373 (Fed. Cir. 2010) (notice letter "must communicate a charge of infringement of specific patents by a specific product or group of products" and later "discovery of ***other models and related products*** may bring those products within the scope of the notice."); *see also Minks v. Polaris Indus.*, 546 F.3d 1364, 1376 (Fed. Cir. 2008) (notice may be given "prior to the date" patentee discovers infringement).

had no policies to investigate infringement claims.  *See* D.I. 425-2 at Clips 47-48.

After considering all the evidence, the jury found willful infringement.  *See* D.I. 479, Day 8 Trial Tr. at 17:12-20 ("you should consider all of the facts surrounding the infringement"); *Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1225 (Fed. Cir. 2006) ("A finding of willful infringement is made after considering the totality of the circumstances.  The evidence is weighed and evaluated by the trier of fact.").  The jury's verdict is supported by substantial evidence and the Court should deny JMOL.

### 1.     Epistar's Notice was Adequate

LHC argues that the April 2016 notice letter was insufficient to provide actual notice because it does not identify the specific products ultimately found to infringe. LHC's argument is unsupported by any legal authority, suggests that a patent owner must have proof of infringement before providing notice of its infringement concerns, and incorrectly assumes that willful infringement can be premised only on conduct (*i.e.*, product sales) known by the patent owner to be occurring when sending the notice letter.

Here, Epistar notified LHC when Epistar became concerned about LED light bulbs being sold by LHC.  When LHC began selling the adjudicated and infringing products at issue, it did so with full knowledge of these patents and despite Epistar's stated concerns. LHC then blinded itself to the risk that any future products it may launch also infringed Epistar's patents by not investigating the scope of any infringement or the validity of the asserted patents, and by taking no other action to clear the infringing products or even discussing Epistar's concerns with the manufacturer.  *See Sunoco P'ship Mktg. & Terminals L.P. v. U.S. Venture, Inc.*, 436 F. Supp. 3d 1099, 1135 (N.D. Ill. 2020) ("Ultimately, the court is troubled that Venture chose, with full knowledge of the infringement risk because of this suit, to dramatically expand its use"); *Powell v. Home Depot U.S.A., Inc.*, 715 F. Supp. 2d 1285, 1296–97 (S.D. Fla. 2010), *aff'd*, 663 F.3d 1221 (Fed. Cir. 2011) ("Home Depot . . . continued using the copies after it became aware of the [patent].").

LHC further argues that that Epistar did not identify specific patent claims in its

letter and that Epistar "insisted on the entry of a non-disclosure agreement."  LHC cites no authority to support this argument, which simply reargues the evidence.

### 2.     The Jury Was Permitted to Consider LHC's Post-Suit Conduct

LHC also argues that the jury impermissibly relied on post-suit conduct to find willfulness.  This argument fails for two reasons.  First, there is nothing that shows the jury based its willfulness determination *solely* on LHC's post-litigation conduct.  Second, the case law is clear that an infringer's post-suit conduct is highly relevant to the related issues of willfulness and enhancement of damages.

For example, as one district court recently noted, whether an infringer demonstrates an unrepentant nature *during the pendency of the litigation* is a relevant inquiry to willfulness.  *See Eagleview Techs., Inc. v. Xactware Sols., Inc.*, 522 F. Supp. 3d 40, 53–54 (D.N.J. 2021) (such facts "evince[] an unrepentant defendant"; collecting cases).  As part of the totality of circumstances, the jury was permitted to consider whether LHC's post-suit conduct demonstrated LHC's unrepentant nature and willful conduct.

The cases on which LHC relies do not mandate a different result.  Those cases only address situations where the claim of willful infringement is predicated *solely* on post-suit conduct, which is not the case here.[13]

### III.   **CONCLUSION**

Epistar respectfully asks the Court to deny LHC's consolidated post-trial motion.

---

[13] *See Zapfraud, Inc. v. Barracuda Networks*, 528 F. Supp. 3d 247, 250 (D. Del. 2021) ("the complaint itself cannot be the source of the knowledge"); *Adidas Am., Inc. v. Skechers USA, Inc.*, No. 3:16-CV-1400-SI, 2017 WL 2543811, at *4 (D. Or. June 12, 2017) ("Plaintiffs do not allege, for example, how or when Defendant acquired its knowledge of the patents-in-suit."); *CG Tech. Dev., LLC v. FanDuel, Inc.*, No. 2:16-CV-00801-RCJ-VCF, 2017 WL 58572, at *6 (D. Nev. Jan. 4, 2017) ("a willful infringement plaintiff . . . must allege some egregious misconduct occurring before the initial claim of infringement was filed"); *Radware, Ltd. v. F5 Networks, Inc.*, No. 5:13-CV-02024-RMW, 2016 WL 4427490, at *6 (N.D. Cal. Aug. 22, 2016) ("since Radware did not seek a preliminary injunction, it is not entitled to a finding of willfulness based solely on F5's post-complaint infringement.").

Dated:  February 18, 2022                    WILSON SONSINI GOODRICH & ROSATI

Professional Corporation

By: /s/ James C. Yoon

James C. Yoon
Ryan R. Smith
Albert Shih
Christopher Mays
**WILSON SONSINI GOODRICH & ROSATI**
Professional Corporation
650 Page Mill Road
Palo Alto, California 94304-1050
Telephone: (650) 493-9300
jyoon@wsgr.com
rsmith@wsgr.com
ashih@wsgr.com
cmays@wsgr.com

Lucy Yen
**WILSON SONSINI GOODRICH & ROSATI**
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, New York 10019-6022
Telephone: (212) 999-5800
lyen@wsgr.com

Celine Liu
**WILSON SONSINI GOODRICH & ROSATI**
Professional Corporation
1700 K Street NW, Fifth Floor
Washington, District of Columbia 20006-3817
Telephone: (202) 973-8800
celine.liu@wsgr.com

*Attorneys for Epistar Corporation*